IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | |
|---|---|
| JOHN PARIS, as Administrator for the Estate of VICTORIA L. PARIS, and in his personal capacity, <br><br> Plaintiff, <br><br> vs. <br><br> WEXFORD HEALTH SOURCES, INC., DR. RONALD SCHAEFER, DR. RALPH GAUEN, DR. MICHAEL BREWER, DR. GEORGE DUNCAN, DR. VIDYA MORISETTY, NURSE EDITHA STOKES, NURSE JOANN BENWAY, NURSE SHANNON FUCHS, NURSE BRENDA CRIST, NURSE LISA SMITH, NURSE HEATHER SPENGLER, NURSE RHONDA BEARD, and, PHYSICIAN ASSISTANT JANE DOE, in their individual capacities, <br><br> Defendants. | CASE NO. <br> JUDGE |

## COMPLAINT

John Paris, as Administrator for the Estate of his late wife, Victoria L. Paris, and in his personal capacity, by and through his attorneys, Jenner & Block LLP, alleges upon personal knowledge and upon information and belief against Defendants Wexford Health Sources, Inc. ("Wexford"), Dr. Ronald Schaefer, Dr. Ralph Gauen, Dr. Michael Brewer, Dr. George Duncan, Dr. Vidya Morisetty, Nurse Editha Stokes, Nurse Joann Benway, Nurse Shannon Fuchs, Nurse Brenda Crist, Nurse Lisa Smith, Nurse Heather Spengler, Nurse Rhonda Beard, and Physician Assistant Jane Doe (the "Decatur Medical Staff"; together with Wexford, collectively, "Defendants") as follows:

## INTRODUCTION

1.     Victoria Paris was a 14-year bladder cancer survivor who, due to Defendants' deliberate indifference to her medical needs, ultimately succumbed to stage 4 bladder cancer March 16, 2020, at the age of 61.  In the end, she endured months of physical and emotional pain

and suffering caused by Defendants' actions and inaction as her medical care providers during her incarceration at Decatur Correctional Center.[1]

2. After receiving competent medical care prior to her incarceration in November 2005, Ms. Paris's first bout with bladder cancer resulted in the cancer going into remission in October 2005. Her medical history required Ms. Paris to be tested every six months to one year for the rest of her life to ensure early detection and proper treatment if the cancer were to return. Until 2018, sporadic surveillance testing by Defendants showed no signs of cancer.

3. But on November 6, 2018, surveillance testing caught potential warning signs that Ms. Paris's cancer had returned. Following weeks and months of Defendants' delays, Ms. Paris underwent a cystoscopy and ureteroscopy by an outside specialist, Dr. David Roszhart, on March 18, 2019. Dr. Roszhart was unable to access the areas that displayed the warning signs and therefore was unable to take any biopsies. He recommended that Ms. Paris see a different urologist for a second opinion, and suggested that if the second opinion did not yield the right results, Ms. Paris may need a procedure to place a stent to allow access to the areas that he had not been able to access.

4. Defendants entirely ignored Dr. Roszhart's request for a second opinion. Instead, they scheduled a nephrostomy tube surgery to place the stent. This understandably confused Ms. Paris, who had been told by Dr. Roszhart that she needed a second opinion. In her confusion, Ms. Paris told Defendants that she wanted to decline the surgery. In response, Defendants refused to follow any of Dr. Roszhart's recommendations and took no action to follow up on the warning signs that Ms. Paris's cancer had returned. Defendants also failed to inform Ms. Paris, who Defendants treated and prescribed medications for several mental illnesses, of the significance of the nephrostomy tube surgery and failed to inform her of the potential consequences of declining the surgery. Defendants' failures deprived Ms. Paris of the medical information necessary to make

[1] Prior to Ms. Paris's marriage to Mr. Paris in 2008, Ms. Paris's legal name was Victoria Lynn McCue. Although she officially changed her name to Victoria Lynn Paris, the Illinois Department of Correction records refer to her as Victoria McCue.

an informed decision about her medical treatment. If not for Defendants' deliberate indifference to Ms. Paris' right to informed consent, she would have accepted the nephrostomy tube surgery.

5. Defendants then took no further steps for the next six months, despite the clear risk of Ms. Paris's cancer recurring. During those six months, Defendants saw Ms. Paris over twenty times, and yet Defendants failed to request or schedule a second opinion or any urology appointment for Ms. Paris. Defendants also failed to request any CT scans, imaging procedures, or biopsies. During these six months, Ms. Paris told Defendants on at least fifteen separate occasions that she was experiencing intense pain when she urinated, that there were large amounts of blood in her urine, and that she was having severe incontinence, all warning signs of cancer. Still, Defendants failed to order a second opinion, did not provide her a referral to an urologist, and failed to order CT scans, additional imaging, a biopsy, or other follow-up procedures.

6. By the time Ms. Paris finally saw a second urologist in October 2019, it was too late. In November 2019, Ms. Paris was diagnosed with stage 4 bladder cancer that had spread to her kidneys and lungs. Ms. Paris passed away on March 16, 2020, only four months after her diagnosis and just four days after her compassionate release from prison.

7. Because of Defendants' delays and deliberate indifference to Ms. Paris's serious medical condition, Ms. Paris suffered months of prolonged and unnecessary pain and suffering while the cancer spread unchecked in her body, ultimately resulting in her untimely death. If not for Defendants' failures, Ms. Paris's cancer could have been diagnosed earlier and treated before it spread. Defendants' deliberate indifference violated Ms. Paris's Eighth Amendment right to be free from cruel and unusual punishment and her Fourteenth Amendment right to informed consent. Mr. Paris, as Administrator of the Estate of Victoria L. Paris, seeks redress of these rights under 42 U.S.C. § 1983.

8. Defendants' conduct also constituted medical malpractice and institutional negligence, caused the wrongful death of Ms. Paris, and deprived Mr. Paris of Ms. Paris's love, society, and companionship. Because of Defendants' conduct, as well as Defendant Wexford's

policies and procedures related to such conduct, Ms. Paris endured prolonged and unnecessary physical and emotional pain and suffering, and died prematurely.

## PARTIES

9.     Plaintiff John Paris is a citizen of the United States and a resident of Bradley, Illinois. Mr. Paris is the surviving spouse of Victoria Lynn Paris and Administrator for the Estate of Victoria L. Paris. Ms. Paris was incarcerated in 2005 and in the custody of the Illinois Department of Corrections ("IDOC") at Decatur Correctional Center from April 20, 2017, until March 12, 2020.[2] At all relevant times to this action, Ms. Paris was an inmate at Decatur. On March 11, 2020, Governor Jay Robert Pritzker commuted Ms. Paris's sentence to time served. She was released from IDOC custody on March 12, 2020, and passed away only a few days later on March 16, 2020. Mr. Paris brings this action on behalf of himself and the Estate of Victoria L. Paris.

10.     Defendant Wexford Health Sources, Inc. ("Wexford") is a corporation formed under the laws of the state of Florida with its principal place of business in Pittsburgh, Pennsylvania. At all relevant times, Wexford had a contractual relationship with IDOC. Pursuant to that contractual relationship, IDOC, an agency of the state of Illinois, delegated responsibility for providing reasonable medical care to inmates in IDOC custody to Wexford. As an IDOC agent exercising delegated governmental functions, Wexford is a state actor under 42 U.S.C. § 1983. Because of Ms. Paris's status as an inmate at Decatur Correctional Center, Wexford was responsible for Ms. Paris's medical care.

11.     Defendant Dr. Ronald Schaefer is a physician employed by Wexford. Defendant Dr. Schaefer specializes in internal medicine. At all times relevant to this action, Defendant Dr.

---

[2] Ms. Paris was in the custody of the Kankakee County Sheriff's Office and incarcerated at the Jerome Combs Detention Center from November 2005 to May 2007 and December 2011 to December 2014. Ms. Paris was in the custody of IDOC and incarcerated at Dwight Correctional Center in May 2007, Lincoln Correctional Center from May 2007 to December 2011, and Logan Correctional Center from December 2014 to April 2017.

Schaefer served as a part of the medical staff at Decatur Correctional Center. Because of Ms. Paris's status as an inmate at Decatur Correctional Center, Defendant Dr. Schaefer was responsible for Ms. Paris's medical care.

12. Defendant Dr. Ralph Gauen is a physician employed by Wexford. Defendant Dr. Gauen specializes in internal medicine. At all times relevant to this action, Defendant Dr. Gauen served as a part of the medical staff at Decatur Correctional Center. Because of Ms. Paris's status as an inmate at Decatur Correctional Center, Defendant Dr. Gauen was responsible for Ms. Paris's medical care.

13. Defendant Dr. George Duncan is a physician employed by Wexford. Defendant Dr. Duncan specializes in internal medicine. At all times relevant to this action, Defendant Dr. Duncan served as part of the medical staff at Decatur Correctional Center. Because of Ms. Paris's status as an inmate at Decatur Correctional Center, Defendant Dr. Duncan was responsible for Ms. Paris's medical care.

14. Defendant Dr. Vidya Morisetty is a physician employed by Wexford. Defendant Dr. Morisetty specializes in obstetrics and gynecology. At all times relevant to this action, Defendant Dr. Morisetty served as part of the medical staff at Decatur Correctional Center. Because of Ms. Paris's status as an inmate at Decatur Correctional Center, Defendant Dr. Morisetty was responsible for Ms. Paris's medical care.

15. Defendant Dr. Michael Brewer is a physician employed by Wexford. Defendant Dr. Brewer specializes in family medicine. At all times relevant to this action, Defendant Dr. Brewer served as a part of the medical staff at Decatur Correctional Center. Because of Ms. Paris's status as an inmate at Decatur Correctional Center, Defendant Dr. Brewer was responsible for Ms. Paris's medical care.

16. Upon information and belief, Defendant Nurse Editha Stokes is an employee of IDOC or Wexford. At all times relevant to this action, Defendant Nurse Stokes served as part of the medical staff at Decatur Correctional Center. Because of Ms. Paris's status as an inmate at

Decatur Correctional Center, Defendant Nurse Stokes was responsible for Ms. Paris's medical care.

17.     Upon information and belief, Defendant Nurse Joann Benway is an employee of IDOC or Wexford.  At all times relevant to this action, Defendant Nurse Benway served as part of the medical staff at Decatur Correctional Center.  Because of Ms. Paris's status as an inmate at Decatur Correctional Center, Defendant Nurse Benway was responsible for Ms. Paris's medical care.

18.     Upon information and belief, Defendant Nurse Shannon Fuchs is an employee of IDOC or Wexford.  At all times relevant to this action, Defendant Nurse Fuchs served as part of the medical staff at Decatur Correctional Center.  Because of Ms. Paris's status as an inmate at Decatur Correctional Center, Defendant Nurse Fuchs was responsible for Ms. Paris's medical care.

19.     Upon information and belief, Defendant Nurse Brenda Crist is an employee of IDOC or Wexford.  At all times relevant to this action, Defendant Nurse Crist served as part of the medical staff at Decatur Correctional Center.  Because of Ms. Paris's status as an inmate at Decatur Correctional Center, Defendant Nurse Crist was responsible for Ms. Paris's medical care.

20.     Upon information and belief, Defendant Nurse Lisa Smith is an employee of IDOC or Wexford.  At all times relevant to this action, Defendant Nurse Smith served as part of the medical staff at Decatur Correctional Center.  Because of Ms. Paris's status as an inmate at Decatur Correctional Center, Defendant Nurse Smith was responsible for Ms. Paris's medical care.

21.     Upon information and belief, Defendant Nurse Heather Spengler is an employee of IDOC or Wexford.  At all times relevant to this action, Defendant Nurse Spengler served as part of the medical staff at Decatur Correctional Center.  Because of Ms. Paris's status as an inmate at Decatur Correctional Center, Defendant Nurse Spengler was responsible for Ms. Paris's medical care.

22.     Upon information and belief, Defendant Nurse Rhonda Beard is an employee of IDOC or Wexford.  At all times relevant to this action, Defendant Nurse Beard served as part of

the medical staff at Decatur Correctional Center. Because of Ms. Paris's status as an inmate at Decatur Correctional Center, Defendant Nurse Beard was responsible for Ms. Paris's medical care.

23. Upon information and belief, Defendant Physician Assistant Jane Doe worked as part of the medical staff at Decatur Correctional Center during the relevant period as an employee of IDOC or Wexford. Because of Ms. Paris's status as an inmate at Decatur Correctional Center, Defendant Jane Doe was responsible for Ms. Paris's medical care. Defendant Jane Doe stated to both Ms. Paris and Mr. Paris on separate occasions that because Ms. Paris declined her nephrostomy tube surgery, "there's nothing we can do."

**JURISDICTION AND VENUE**

24. Mr. Paris, as Administrator to the Estate of Victoria L. Paris, brings a federal civil rights claim pursuant to 42 U.S.C. § 1983. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343. Mr. Paris also brings several state law claims on behalf of himself and the Estate of Victoria L. Paris. This Court has subject matter jurisdiction over Mr. Paris's state law claims pursuant to 28 U.S.C. § 1367.

25. Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in the Central District of Illinois. The Urbana Division is the proper division because the case arises from Macon County, Illinois.

**FACTUAL ALLEGATIONS**

**I.      Ms. Paris's History of Bladder Cancer**

26. Ms. Paris was first diagnosed with bladder cancer in November 2004. After months of treatment and competent medical care, the cancer went into remission in October 2005. Ms. Paris's physicians at the time advised her that the cancer had a fifty-percent chance of recurrence within the first year of remission and a smaller continuing chance of recurrence after the first year. They advised her that she would need surveillance testing every six months to one year for the rest of her life to ensure early detection and proper treatment in the event the bladder cancer were to return.

## II.     Defendants' Responsibility for Ms. Paris's Medical Care

27.     Ms. Paris first entered into IDOC custody in May 2007.  From April 2017 until her release in March 2020, IDOC housed Ms. Paris at Decatur Correctional Center, where she was under the medical care of Defendants.

28.     Defendants were aware of Ms. Paris's past history with bladder cancer and were responsible for ensuring she receive ongoing surveillance testing.  This required them to order and pay for specialty care like urology appointments, cystoscopies, ureteroscopies, CT scans, and biopsies.

29.     Ms. Paris took her surveillance seriously.  In the face of significant challenges to receiving specialized medical care while incarcerated, Ms. Paris advocated for herself to receive the necessary surveillance testing.  For example, in 2009, Ms. Paris wrote to her urologist that prison officials were not following his recommendation that Ms. Paris be seen every six months and had instead scheduled yearly follow ups.  And in July 2018, Ms. Paris filed a grievance against Defendant Dr. Schaefer after he told her that he would not send Ms. Paris to an urologist for the remainder of her incarceration.  Notwithstanding these obstacles, and even though the surveillance testing was sporadic, the surveillance testing Ms. Paris did receive until 2018 showed no signs of a return of the cancer.

30.     Defendants were aware that Ms. Paris struggled with, and was treated by Defendants for, various mental health issues.  Defendants diagnosed Ms. Paris with panic disorder, anxiety disorder, depressive disorder, and antisocial personality disorder.  Defendants prescribed Ms. Paris medication for these conditions and were also aware of her pre-incarceration mental health treatment and medications.

## III.     Defendants' Failure to Promptly Respond to Ms. Paris's Risk of Cancer

### A.  Defendants Received Express Notice of a Significant Risk of Cancer

31.     On November 6, 2018, Ms. Paris underwent a CT scan of her abdomen and pelvis at Decatur Memorial Hospital.  Dr. Mark Muscato, a radiologist at Decatur Memorial, observed a

"persistent abnormality" in Ms. Paris's left kidney, "significant urothelial thickening," and an "apparent irregularity" on the posterior wall of the bladder. Given Ms. Paris's past CT scans and history of bladder cancer, Dr. Muscato recorded that these findings "raise the possibility of residual / recurrent malignancy." Dr. Muscato also observed one pulmonary nodule—that is, an abnormal growth in the lungs—in the lower lobe of the right lung. Dr. Muscato recommended further evaluation of these findings.

32.     On November 13, 2018, Ms. Paris saw Defendant Dr. Schaefer. Defendant Dr. Schaefer told Ms. Paris that he would put in a request for her to see a specialist who would explain the results of the CT scan. The next day, Defendant Dr. Schaefer told Ms. Paris that Wexford approved the request for an outside urologist appointment. However, Wexford did not make an appointment for Ms. Paris to see an urologist at that time.

33.     In fact, Ms. Paris did not see an urologist until two and a half months later on January 24, 2019. During that time, Ms. Paris complained to Defendants of chronic incontinence. On December 6, 2018, Ms. Paris told Defendant Dr. Schaefer that she was experiencing a "urinary retention issue," and she requested diapers for her trip to the urologist. Ms. Paris repeated this complaint twice, first to Defendant Nurse Stokes on December 8, 2018, and then again to Defendant Dr. Schaefer on December 10, 2018. Defendants did not promptly seek an urologist's opinion at that time.

34.     Ms. Paris finally saw an urologist, Dr. David Roszhart of the Springfield Clinic, on January 24, 2019. To investigate the previously-spotted abnormalities in Ms. Paris's left kidney, ureters, and posterior wall of the bladder, Dr. Roszhart ordered tests to further assess the possibility that Ms. Paris's cancer had returned. Dr. Roszhart ordered a urine culture, a urine cytology, and a FISH test, followed by a CT scan, cystoscopy, retrograde pyelogram, and bladder biopsy. These tests are pivotal in diagnosing bladder cancer. Dr. Roszhart communicated the results to Defendants in a written report.

35.     On February 7, 2019, two weeks after Dr. Roszhart requested the procedures and imaging, Wexford approved the cystoscopy, the CT scan, and the retrograde pyelogram through its Collegial Review process.[3]

36.     On February 26, 2019, almost three weeks after Wexford's approval, Ms. Paris underwent a CT scan at Decatur Memorial Hospital.  The CT scan showed uroepithelial thickening, particularly in the left ureter.  These findings raised the possibility of neoplasm—that cells were growing abnormally.

37.     On March 12, 2019, Ms. Paris met with Defendant Dr. Schaefer to discuss her chronic hematuria—presence of blood in urine.  Defendant Dr. Schaefer told her, with no explanation, that her hematuria "does not appear to be from bladder cancer."

**B. Defendants Ignored the Outside Urologist's Recommendation**

38.     On March 18, 2019, almost three weeks after her CT scan, Ms. Paris saw Dr. Roszhart for a cystoscopy and an ureteroscopy.  However, Dr. Roszhart was unable to complete the procedure.  He was unable to locate the left ureteral orifice—the point where the left ureter connects to the bladder.  Since he could not find the orifice, Dr. Roszhart did not perform biopsies in the bladder or the ureter.  Not finding the orifice also meant that Dr. Roszhart could not perform an ureteroscopy to inspect Ms. Paris's left ureter.  Accordingly, Dr. Roszhart terminated the procedure and recommended that Ms. Paris receive further specialty care.  Specifically, he recorded that they will "have the patient see somebody else for a second opinion," and that Ms. Paris "may need an IR antegrade stent placed to gain access into the left ureter."  He told Ms. Paris that she should get the second opinion first to confirm whether the stent procedure would be necessary.

---

[3] "Collegial Review" is the process required by Wexford for any inmate to receive specialty care, diagnostics, testing, or imaging.  A Wexford employee must first request Collegial Review for a given procedure or referral.  The request is then presented to a group of offsite physicians and nurses, who consult with facility physicians on whether to approve the request.  Inmates must obtain Wexford's approval through its Collegial Review process before an appointment is scheduled.

39.     On April 12, 2019, almost a month after her visit with Dr. Roszhart, Ms. Paris met with Defendant Dr. Brewer to review Dr. Roszhart's report.  Defendant Dr. Brewer noted that Dr. Roszhart observed an "undiagnosed abnormality" in the left ureter but that he was unable to access the left ureter opening to perform a biopsy.  Rather than follow Dr. Roszhart's instruction to first order a second opinion, Defendant Dr. Brewer requested Ms. Paris be sent to Interventional Radiology at Decatur Memorial Hospital for a nephrostomy tube surgery to place the stent.

40.     The nephrostomy tube surgery would entail sedating Ms. Paris, cutting a small opening into her back, and placing a tube into her kidney to access the ureter.  During this procedure, the surgeon could place a stent in her ureter, thereby giving doctors access to her left ureter without having to find the left ureter orifice.  Thus, with this surgery, an urologist could potentially complete the ureteroscopy and biopsies in Ms. Paris's left ureter.  On information and belief, Defendant Dr. Brewer did not explain any of this to Ms. Paris and failed to provide Ms. Paris with any explanation as to the potential significance of the nephrostomy tube surgery or the risks of forgoing the surgery.

41.     Defendants scheduled the surgery for April 26, 2019.  On April 23, 2019, Ms. Paris saw Defendant Nurse Benway, who explained the basic process for the surgery inserting the nephrostomy tube and stent, but did not explain the significance of the surgery or the risks of forgoing the surgery.

42.     On April 25, 2019, Ms. Paris saw Defendant Nurse Fuchs and declined the nephrostomy tube surgery because Dr. Roszhart had recommended the second opinion first.  She further told Defendant Nurse Fuchs that she wanted to speak to Dr. Roszhart about the surgery.

43.     On information and belief, no one told Ms. Paris that if she declined the nephrostomy tube surgery, then doctors would be unable to evaluate her left ureter.  On information and belief, no one told Ms. Paris that declining the surgery could entail the risk that any developing cancer would go undetected.

44. After Ms. Paris declined the surgery, Defendants took no action in response. Despite Dr. Roszhart's instruction that Ms. Paris receive a second opinion, and Ms. Paris's request for that second opinion, Defendants failed to order one.

45. For the next six months, Ms. Paris repeatedly requested she be referred to an urologist for a second opinion, as Dr. Roszhart had recommended. Nearly every day during this time period when Ms. Paris stood in the "Med line" at the prison to receive her medications, she asked about the status of the second opinion appointment. Defendants told Ms. Paris "you are refusing so there's nothing we can do."

46. John Paris, as Ms. Paris' Medical Power of Attorney, also attempted to speak with Wexford's medical staff about Ms. Paris receiving a referral to an urology specialist for a second opinion. Defendant Physician Assistant Jane Doe told Mr. Paris that "Vikki refused, so there's nothing we can do."

47. In May 2019, Ms. Paris consistently displayed to Defendants that she was experiencing painful urination and blood in her urine. On May 8, 2019, Ms. Paris saw Defendant Nurse Crist and told her about daily vaginal bleeding and that the pain was a "9-10" when it occurred. On May 10, 2019, Ms. Paris saw Defendant Dr. Brewer for uterine cramping, vaginal bleeding, and urinary incompetence. Defendant Dr. Brewer did not order any tests or a referral request for an urologist. Defendant Dr. Brewer instead ordered adult diapers and put in an appointment with Defendant Dr. Morisetty. On May 18, 2019, Ms. Paris saw Defendant Dr. Morisetty. Ms. Paris also experienced a surge of symptoms on May 30, 2019, and had to be admitted to sick call. Ms. Paris told Defendant Nurse Fuchs she was experiencing "burning" urination and "red wine color[ed]" urine. Ms. Paris said that the burning feeling occurred all the time, even when not urinating. Defendant Nurse Fuchs did a urine dip-stick test, but nothing more. At no point did any of these medical staff seek a follow-up urology appointment for Ms. Paris, or schedule any scans, scopes, or biopsies.

48. The same inaction continued for the next five months. On June 6, 2019, Ms. Paris saw Defendant Dr. Duncan about her incontinence. Defendant Dr. Duncan is an internal medicine

specialist, not an urologist or oncologist. Ms. Paris also requested additional sanitary pads. On June 23, 2019, Ms. Paris experienced a surge of symptoms and had to go on sick call. A few days later, on June 27, 2019, Ms. Paris experienced another surge of symptoms—back pain, burning urination, bloody urine, and incontinence—and was again admitted to sick call. Ms. Paris saw Defendant Nurse Smith, who noted that Ms. Paris's urine was "chronically bloody." Defendant Nurse Smith considered the frequent and painful urination "normal" for Ms. Paris, and did not order any further testing. Just like in May, at no point did any of these doctors or nurses seek a follow-up urology appointment for Ms. Paris, or schedule further diagnostic testing.

49.     In July of 2019, Ms. Paris was still suffering and waiting for her second opinion from a specialist. On July 3, 2019, Defendant Dr. Duncan warned Ms. Paris that he would not send her to an urologist "because there was no reason to."

50.     Despite Dr. Roszhart's instructions that Ms. Paris either needed a second opinion or an antegrade stent, Defendant Dr. Duncan told Ms. Paris that he would only refer Ms. Paris to an urologist if she sought admission to the infirmary to monitor her urine culture, and if the culture came back positive. Ms. Paris agreed only to the urine culture.

51.     On July 17, 2020, Defendant Nurse Spengler told Ms. Paris that her urine culture was "suggestive of contamination," and the next day, Defendant Dr. Duncan reviewed the culture and said there were no abnormalities. Even though Defendant Dr. Duncan knew Ms. Paris had a history with cancer, knew that she had been experiencing symptoms of bladder cancer for the past six months, and knew that her CT scans showed abnormalities in her bladder and kidneys, he insisted that Ms. Paris was suffering from atrophic vaginitis—the drying of the vaginal walls. Rather than give her the follow-up her specialist requested, Defendant Dr. Duncan gave her hormone cream. Four months had passed since Ms. Paris's cystoscopy on March 18, 2019, and still none of the Defendants had sought a second opinion for Ms. Paris, or scheduled any diagnostic tests.

52.     On August 4, 2019, Ms. Paris suffered another surge of symptoms and was admitted to sick call. She saw Defendant Nurse Beard for back pain and told her that her urine was "always

red." During this time, she was urinating every fifteen to thirty minutes, and it was painful. On August 18, 2019, Ms. Paris told Defendant Dr. Morisetty that she was bleeding from her urethra, not from her vagina. Defendant Dr. Morisetty recorded that Ms. Paris was "being seen by [a] urologist," but he did not actually put in a request that Ms. Paris *see* her urologist. Five months had passed, and Ms. Paris was still waiting for a second opinion.

53.     On September 15, 2019, Ms. Paris saw Defendant Nurse Beard and told her that she was urinating with blood hourly. On September 16, Defendant Dr. Duncan saw Ms. Paris and wrote that she was experiencing "pain," which he placed in quotation marks. Defendant Dr. Duncan ordered that a doctor review Ms. Paris's chart to determine "the need" for a second opinion on urologic problems. It had been six months since Dr. Roszhart had submitted his report asking for a second opinion.

54.     In the fall of 2019, Defendant Nurse Benway told Ms. Paris to get all the help she could to get out of prison. Otherwise, Defendant Nurse Benway said, Ms. Paris was going to die in prison.

**C. After Almost Seven Months, Ms. Paris Finally Received a Second Opinion**

55.     On October 7, 2019, Defendant Dr. Duncan informed Ms. Paris that she was scheduled to see Dr. Michael Kottwitz, an urologist at Decatur Memorial Hospital, for evaluation and a CT scan.

56.     On October 10, 2019, nearly seven months after her cystoscopy and ureteroscopy with Dr. Roszhart, Ms. Paris saw Dr. Kottwitz. Dr. Kottwitz told Ms. Paris that he planned to do a cystoscopy, a bilateral retrograde pyelogram, a bladder biopsy, an ureteroscopy of her left ureter, a ureteral biopsy, and possibly a left ureteral dilation or a stent placement in her left ureter.

57.     On October 24, 2019, Ms. Paris underwent a CT scan of her abdomen and pelvis. Dr. Kottwitz reported that new nodules were found in her lungs, and the nodule identified in her November 6, 2018 CT scans had enlarged. He reported that her lymph nodes were swelling, that her ureter's lining was thickening, and that there was concern for malignancy in her ureter. Dr.

Kottwitz also added that he thought there was a tumor or blood clot in Ms. Paris's left kidney. These tests raised the suspicion that Ms. Paris had metastatic left urothelial cancer.

58.     On October 25, 2019, Dr. Kottwitz performed a cystoscopy, a left ureteroscopy, a bladder biopsy, and a kidney biopsy on Ms. Paris. Dr. Kottwitz found degenerated atypical cells in both her bladder and left kidney, and neither biopsy could exclude malignancy. The ureteroscopy, the procedure Dr. Roszhart was unable to complete in March 2020, uncovered filling defects in Ms. Paris's ureters, consistent with malignancy. After running these tests, Dr. Kottwitz reported that there was a good possibility Ms. Paris had cancer.

59.     Ms. Paris continued to suffer. In the days following, she reported to Defendant Nurse Beard twice that she was having intense pain when she urinated, and that when she was not urinating, it felt like childbirth. Ms. Paris's incontinence was also increasing: she would use 20 pads a day and other inmates even started giving Ms. Paris their spare sanitation pads.

60.     On October 28, 2019, Defendant Dr. Duncan told Ms. Paris that she likely had cancer. A few days later, he scheduled a whole body PET scan and biopsies of her lung nodule and lymph nodes.

61.     On November 6, 2019, Ms. Paris had biopsies taken, which confirmed the presence of urothelial carcinoma in both her kidneys and periaortic lymph nodes.

62.     On November 8, 2019, Dr. Kottwitz told Ms. Paris that she had high-grade urothelial carcinoma, and that she should begin consulting oncology specialists. Three days later, on November 11, 2019, Defendant Dr. Duncan told Ms. Paris that the cancer was either stage 3 or stage 4.

63.     On November 19, 2019, a full-body PET scan confirmed the presence of the cancer. Ms. Paris's oncologist estimated that Ms. Paris had one year to live without chemotherapy and only one and a half to two years with chemotherapy. Ms. Paris opted to forego chemotherapy.

64.     Ms. Paris sought clemency from Governor Jay Robert Pritzker in January 2020. The Governor granted her clemency petition on March 11, 2020.

65.     On March 12, 2020, Ms. Paris was released from prison into Mr. Paris's care. Despite being told that she had a year to live, Ms. Paris passed away four days later, on March 16, 2020.

**IV.     Wexford's Policies, Customs, and Practices Harmed Ms. Paris**

66.     Under its contract with the State of Illinois, Wexford is obligated to ensure that all medical services are provided to IDOC inmates in accordance with medically accepted American Correctional Association standards of care.

67.     On information and belief, Wexford has adopted policies, customs, and practices that, rather than ensure quality and timely care, result in reduced and delayed access to care and/or inadequate care.  These include, but are not limited to, a custom of inaction, a practice of discouraging referrals, a failure to make policy for the treatment of inmates with high risk of terminal illness, and a practice of not communicating important medical information.

**A.  Wexford's Custom of Inaction and Practice of Discouraging Referrals**

68.     On information and belief, Wexford has a custom of inaction and a practice of discouraging referrals for specialists and diagnostic testing.  This is done in an effort to reduce costs.

69.     In or about 2011, the State of Illinois awarded Wexford a contract valued in excess of $1 billion to provide medical care to inmates in every prison operated by IDOC.

70.     On information and belief, Wexford's contract with Illinois provides for a flat payment based on the inmate population.  Therefore, Wexford has an economic incentive to provide minimal medical care to inmates.

71.     To keep costs low, Wexford encourages its physicians to spend minimal amounts of time with patients, does not give its physicians the decision-making authority to order medically indicated tests and procedures, and discourages its physicians from referring patients to outside specialists for specialized care. Such policies and procedures result in the neglect of the actual medical needs of countless inmates, including Ms. Paris.

72.     That this custom of inaction exists and is widespread is evidenced by Wexford's repeated failures, across multiple facilities and years, to provide minimally sufficient specialty care, as documented in the litigation *Lippert v. Godinez*, No. 1:10-cv-04603 (N.D. Ill.).

73.     In 2014, a team of experts appointed by the U.S. District Court for the Northern District of Illinois investigated a representative sample of IDOC facilities to determine whether the health care services in those facilities met the minimum constitutional standards of adequacy. The experts found that Wexford's handling of specialty care suffered "breakdowns in almost every area," including substantial delays in care and the absence of any follow up with the patients. (Final Rep. of the Ct. Appointed Expert 29, December 2014, *Lippert*, No. 1:10-cv-04603, ECF No. 339.)  Many instances of patient morbidity and mortality were directly linked to these breakdowns.  (*Id.* at 29-31.)

74.     In October 2018, a second team of court-appointed experts found no improvement from the first report in the provision of specialty care.  (Rep. of the 2nd Ct. Appointed Expert 52, 63, October 2018, *Lippert*, No. 1:10-cv-04603, ECF No. 767.)  The experts declared that Wexford underutilized specialty care, creating "a major but unmonitored problem."  (*Id.* at 64.)  This was especially true for patients with chronic conditions; the experts reported that Wexford frequently does not refer inmates for specialty care regarding chronic illnesses, and do not consistently integrate specialty findings or recommendations into the inmate's treatment plan.  (*Id.* at 53.)

75.     As part of their review, the 2018 experts reviewed thirty-three death records from a representative sample of IDOC facilities.  (*Id.* at 2.)  In those thirty-three records alone, the experts reported ninety-five instances where Wexford physicians should have requested a specialty procedure, but did not, and eighty-one instances "where specialty consultations should have been requested but were not."  (*Id.* at 65.)  The experts said that these failures were the result of "a learned process of not requesting care" that was systemic "at all facilities we investigated."  (*Id.*)  The experts suggested that IDOC prisons "may have suppressed referral rates because the cost of care is borne by the vendor."  (*Id.* at 68.)

76.     Wexford was aware of the results of this investigation yet made no meaningful changes to its policies and procedures.

77.     The 2018 experts advised that "IDOC providers should be strongly encouraged to request specialty consultations when patients' clinical conditions are complicated, exceed the skills and training of the providers, or are not responding [to] the initial treatment regimens." (*Id.* at 68.)

78.     Despite all of these findings, Wexford's custom of inaction continued. The Northern District of Illinois appointed a monitor in *Lippert* to assess if IDOC facilities were complying with the court's consent decree. In November 2019, the court-appointed monitor reported that he was "increasingly concerned that [Wexford's] Collegial Review process presents a barrier to the access to offsite specialty consultation and tests, delays needed consultations, procedures, and testing, [and] potentially puts patient-inmates' health at risk," and that it was his "preliminary opinion" that "the Collegial Review should be eliminated and replaced." (First Rep. of the Monitor 8-9, November 24, 2019, *Lippert*, No. 1:10-cv-04603, ECF No. 1276.)

79.     In August 2020, the court-appointed monitor reported that Wexford denied specialist referrals to a number of IDOC inmates whose symptoms required specialized care to rule out cancer. (Health Care Monitor 2nd Rep. 113, August 6, 2020, *Lippert*, No. 1:10-cv-04603, ECF No. 1335.) The monitor repeated his recommendation that the collegial review process be eliminated and stated that his recommendation "was noted in the First Court Report and is now reinforced by the examples of inappropriate denials of specialty referrals, tests, procedures, and clinical equipment listed." (*Id.* at 113-14.) In February 2021, the court-appointed monitor reported that a number of IDOC inmates developed cancer despite presenting warning signs to Wexford's medical staff. (Health Care Monitor 3rd Rep. 101-05, February 15, 2021, *Lippert*, No. 1:10-cv-04603, ECF No. 1403.) The court appointed monitor informed the court that despite the prior four reports, there had been no change in the specialty care process and that Wexford still had significant deficiencies in providing inmates with appropriate specialty care, including failures in following up on consultant recommendations, delays in care, and failing to refer inmates to specialists. (*Id.* at 8-9.)

80.     Wexford embraces this custom.   Despite the experts' documented issues with Wexford's specialty care system, Wexford publicly lauds its policies and practices on its website, advertising that its practices result in "fewer requested offsite referrals" and "an overall decrease in specialty consults."

81.     This custom's existence is further evidenced by the numerous lawsuits against Wexford making similar allegations of a custom of inaction, including the following:

i.     In *Dean v. Wexford Health Sources, Inc.*, No. 17-CV-3112, 2020 WL 6255323, at *2 (C.D. Ill. Sept. 28, 2020), a jury in the Central District of Illinois found that Wexford's practices between 2015 and 2017 delayed urgently needed treatment for some inmates and that Wexford's practices delayed treatment for an inmate battling kidney cancer while in Wexford's care.

ii.     In *Steele v. Wexford Health Sources, Inc.*, No. 17 C 6630, 2018 WL 2388429, at *2 (N.D. Ill. May 25, 2018), outside specialists at the University of Illinois-Chicago Medical Center recommended an inmate undergo spinal surgery, but the Wexford physician caring for the inmate did not order surgery for seven months.   The court denied Wexford's motion to dismiss where plaintiff "allege[d] significant delays in his referral to an outside specialist as a direct result of Wexford's cost-cutting policy" and cited to the *Lippert* report and "examples of recent suits against Wexford alleging that Wexford's cost-cutting policy or practice prevented inmates from receiving timely medical treatment." *Id.* at *8.

iii.     In *Arsberry v. Wexford Health Sources, Inc.*, No. 17 C 50044, 2020 WL 30588, at *2 (N.D. Ill. Jan. 2, 2020), an inmate alleged that over the course of three years, several necessary medical procedures were needlessly delayed by Wexford physicians..   The court denied Wexford's motion to dismiss where plaintiff alleged Wexford "refused to submit the question of outside treatment for collegial review or failed to follow the recommendations of collegial

review" which was "motivated by cost-cutting rather than by medical considerations." *Id.* at *3.

iv. In *Gill v. Obaisi*, No. 17-CV-8864, 2019 WL 3386972, at *1 (N.D. Ill. July 26, 2019), an inmate fell and injured his right ring finger. When x-rays revealed a fracture, outside specialists instructed the inmate to return for follow-up in three weeks. *Id.* However, the Wexford physician caring for the inmate never requested that follow-up appointment. *Id.* The court denied a motion to dismiss when the plaintiff alleged that "Wexford receives flat payments based on inmate population and therefore has a profit incentive to provide as little health care to inmates as is possible," resulting "in a policy, practice, or custom of deliberately postponing or refusing treatment at off-site facilities in order to reduce prisoners' medical costs." *Id.* at *2.

82. Ms. Paris also knew of other inmates at Decatur who were injured by Wexford's custom of inaction. One inmate developed cancer during her sentence, and Wexford's medical staff continued their custom of inaction with this inmate. Defendant Dr. Schaefer, in particular, did not refer the inmate for additional treatment, despite her serious medical condition. Immediately after the inmate's sentence was commuted, the inmate died of cancer.

83. On information and belief, this custom of inaction and practice of discouraging referrals motivated the significant delays in conducting Ms. Paris's diagnostic testing, the failure to refer Ms. Paris to a second urologist, and the failure to inform Ms. Paris of the significance of the nephrostomy tube surgery or the risks of declining the surgery. The months of inaction by the Decatur Medical Staff were motivated by this custom and practice.

84. That the Decatur Medical Staff acted in compliance with this custom is evidenced by their consistent and uniform inaction over the span of six months, the pecuniary gain such inaction brought their employer, and the persistence of inaction in light of Ms. Paris's obvious worsening condition.

85.     Wexford knew that this custom and practice would likely cause constitutional violations.  Such a risk was known or obvious by virtue of the reports filed in *Lippert*, the numerous lawsuits filed against it for these customs and practices, and the dozens of complaints communicated to Wexford employees by both Ms. Paris and Mr. Paris.  Yet, Wexford did nothing.

### B. Wexford's Failure to Make Policies for Monitoring and Treating Chronic Illnesses

86.     On information and belief, Wexford deliberately failed to create sufficient policies to monitor and treat inmates who had an elevated risk of terminal disease.

87.     On information and belief, Wexford failed to create any auditing or monitoring policies to ensure that inmates with elevated risk of terminal disease saw specialists or were given their specialist-prescribed treatment.   Furthermore, Wexford failed to create any policies incentivizing employees to fast-track treatment when the inmate had an imminent and elevated risk of terminal disease.

88.     Instead, Wexford relied on insufficient policies.  For example, in the 2014 expert report for *Lippert*, the team of experts found that Wexford had deficient chronic care policies and specialty treatment policies.  (Final Rep. of the Ct. Appointed Expert 19-23, 28-32, *Lippert*, ECF No. 339.)

89.     The 2014 experts specifically advised Wexford to base its scheduling on urgency, and fast-track urgent appointments within 10 days.  (*Id.* at 31.)

90.     Despite this warning, the October 2018 expert report found no improvements in these areas.  (Rep. of the 2nd Ct. Appointed Expert 53, 64, *Lippert*, ECF No. 767.)  Instead, the 2018 experts found a "lack of guidance in policy with respect to specialty care" and no administrative directives on specialty care or timeliness.  (*Id.* at 64.)

91.     In the absence of those policies, the 2018 experts found rampant problems in Wexford's treatment of inmates with chronic illnesses, including:

    i.   Failing to timely or appropriately manage patients whose diseases were not well controlled;

ii. Failing to monitor key tests or other variables with respect to disease management;

iii. Failing to identify or properly manage red-flag or other critical abnormalities involving chronic illness; and

iv. Failing to incorporate specialty recommendations with respect to management of chronic illness. (*Id.* at 52.)

92. The 2018 experts specifically identified inmates with cancer as those likely to go unmonitored. (*Id.* at 54.)

93. The 2018 experts recommended that patients should be seen in accordance with the degree of control of their diseases and that Wexford physicians should refer out inmates to physicians who are trained in handling the inmate's chronic condition. (*Id.* at 131, 133, 136-37.) The experts further said that urgent appointments with specialty care must be achieved within 10 days, with routine specialty appointments occurring within 30 days. (*Id.* at 136.)

94. Still, nothing changed. In the court-appointed monitor's February 2021 report, the monitor found that there had been no change in the specialty care process. (Health Care Monitor 3rd Rep. 8-9, *Lippert*, ECF No. 1403.) The monitor further recommended that Wexford maintain tracking logs which track which procedures were refused, when they were refused, and when the procedures were rescheduled. (*Id.* at 102.) On information and belief, this data was not previously tracked by Wexford.

### C. Wexford's Practice of Withholding Medical Information

95. On information and belief, Wexford maintains a practice of not informing inmates of important details of their treatment.

96. That this practice is widespread is evidenced by the numerous times Wexford staff has failed to inform inmates of medical information essential to making an informed treatment decision.

97.     For instance, several lawsuits have alleged that Wexford staff failed to inform plaintiffs of the side effects of proposed treatment.  *See Meskauskas v. Hansen*, No. 20-CV-1023-JBM, 2020 WL 2089810, at *1 (C.D. Ill. Apr. 30, 2020) (alleging a custom of not informing patients of potential side effects of medication); *Dixon v. Wexford Health Sources, Inc.*, No. 1:16-CV-01458-JEH, 2019 WL 252524, at *1 (C.D. Ill. Jan. 17, 2019) (alleging a failure to warn of medication side effects); *Williams v. Kelly*, No. 15 C 8135, 2017 WL 56642, at *1 (N.D. Ill. Jan. 5, 2017) (alleging that Wexford lacks policies to inform inmates of potential side effects and that Wexford employees failed to inform him of the side effects of his treatment).

98.     That this practice is widespread is evidenced by Wexford's continuous failure to document discussions regarding procedures.  In the February 2021 monitor report, the monitor "evaluated many medical records and seldom [found] that a meaningful discussion with the patient [was] documented."  (Health Care Monitor 3rd Rep. 102, *Lippert*, ECF No. 1403.)  Furthermore, there were no audits to determine if Wexford actually had meaningful discussions with the patient about specialty consultations.  (*Id.* at 101.)

99.     The Decatur Medical Staff acted in compliance with this practice when failing to discuss with Ms. Paris the significance of declining the nephrostomy tube surgery.  The Decatur Medical Staff's compliance is evidenced by their consistent and uniform inaction over the span of six months despite Ms. Paris's worsening condition and continuous requests for a second opinion.

100.     Wexford knew that this custom and practice would likely cause constitutional violations.  Such a risk was known or obvious by the numerous lawsuits against it for this practice.  Yet, Wexford deliberately did nothing.

## V.     Defendants Were Deliberately Indifferent

101.     Defendants responded to Ms. Paris's serious medical condition with deliberate indifference.  Defendants delayed seeking further tests after Ms. Paris's November 6, 2018 CT scans revealed the possibility of cancer.  After weeks and months of delays, Defendants then callously disregarded the outside specialist's recommendation that Ms. Paris see a different urologist for a second opinion regarding her left ureter, despite knowing of Ms. Paris's history of

bladder cancer. For the next seven months, Ms. Paris displayed gross hematuria, dysuria, incontinence, and back pain—the four most common signs of bladder cancer. Still, Defendants did not refer her for a second opinion or order an off-site diagnostic test. That Defendants' delay in referring Ms. Paris was due to Defendants' deliberate indifference is further evidenced by what Defendants did instead. Instead of following the specialist's advice or ordering further off-site testing, they insisted that her symptoms were not because of cancer, and they chalked up her pains as "normal" or the result of atrophic vaginitis. During these delays, Ms. Paris's cancer continued to spread and her prognosis worsened.

102. Moreover, Defendants were deliberately indifferent to Ms. Paris's right to informed consent. Defendants did not provide Ms. Paris with necessary information about the significance of the nephrostomy tube surgery or the risks of declining the surgery. Defendants did not inform Ms. Paris that declining the procedure ran the risk of letting any potential cancer go undetected. Defendants did not tell Ms. Paris that they would not refer her for a second opinion if she declined the surgery. Defendants knew that Ms. Paris wished to receive a second opinion and knew that Ms. Paris was concerned about the possibility of the cancer returning. Yet Defendants chose not to explain to Ms. Paris how the nephrostomy tube surgery might help identify signs of the cancer recurring, precluding her ability to make an informed decision about whether to accept or decline the surgery.

103. Defendants chose not to provide or explain this information to Ms. Paris, despite being aware of Ms. Paris' mental health issues and being aware of the mental health medications Defendants themselves had prescribed her. Defendants' deliberate indifference to Ms. Paris' right to informed consent deprived her of information necessary to make an informed decision about the nephrostomy tube surgery. If not for Defendants depriving Ms. Paris of medically necessary information, she would have accepted the surgery.

## VI.   Ms. Paris Was Seriously Injured by Defendants' Deliberate Indifference

104. Ms. Paris's bladder cancer could have been diagnosed earlier and treated if Defendants had not responded with deliberate indifference. Defendants ignored Dr. Roszhart's

recommendation that Ms. Paris get a second opinion, failing to schedule a second opinion for seven months. During this time, Defendants failed to and refused to order any diagnostic tests that would identify bladder cancer. They ordered no CT scans, no biopsies, no cystoscopies, and no ureteroscopies, and because the cancer was not identified, they did not order any treatment aimed at combatting the cancer spreading in Ms. Paris's system. Moreover, Defendants could have diagnosed and treated Ms. Paris's bladder cancer earlier if they had not been deliberately indifferent to Ms. Paris's right to medical information. Dr. Roszhart told Defendants that an antegrade stent may be necessary for an urologist to further evaluate Ms. Paris's left ureter, but Defendants never told Ms. Paris of that potential necessity. Because of Defendants' deliberate indifference, Ms. Paris's cancer went undiagnosed and untreated for months.

105. Due to Defendants' delays, the cancer went untreated and spread. Defendants' failures to follow the specialist's recommendations and to schedule an appointment with another urologist caused Ms. Paris physical and emotional injuries and cost her valuable time and ultimately her life.

106. If not for Defendants' deliberate indifference toward Ms. Paris's serious medical condition, Ms. Paris's cancer would not have metastasized as quickly as it did and could have been treated before it spread. Ms. Paris's November 6, 2018 CT scans revealed Ms. Paris had only one pulmonary nodule. Once Ms. Paris finally received a second opinion from an urologist in October 2019, after waiting nearly seven months, Dr. Kottwitz discovered new nodules in her lungs. Similarly, Ms. Paris's February 2019 CT scans reported only some urothelial thickening and some possibility of abnormal cell growth. But after Defendants' months of delay, the October 2019 CT scans found cancer in her kidneys, bladder, lungs, and lymph nodes. If Defendants had followed Dr. Roszhart's advice and given Ms. Paris a second opinion, Ms. Paris's cancer would have been identified and treated much sooner. She may even still be alive today.

**COUNT I**

**Violation of the Eighth Amendment to the U.S. Constitution and 42 U.S.C. § 1983**

**(Against the Decatur Medical Staff)**

107.    The allegations of paragraphs 1 through 106 are incorporated herein by reference.

108.    The Decatur Medical Staff, while acting under color of state law, performed their duties in a manner that evidence deliberate, reckless and/or callous indifference to Ms. Paris's serious medical need for diagnosis and treatment of her bladder cancer, thus depriving Ms. Paris of her rights protected by the Eighth Amendment of the United States Constitution.

109.    The Decatur Medical Staff were deliberately indifferent to Ms. Paris's serious medical need when they (1) failed to promptly seek treatment for Ms. Paris's risk of cancer, (2) failed to order Ms. Paris a second urology opinion for seven months, despite Dr. Roszhart's instruction to do so, and (3) failed to refer Ms. Paris to another urologist or order any additional diagnostic tests for seven months.  After a November 2018 CT scan revealed the possibility of cancer, the Decatur Medical Staff delayed scheduling an appointment with an outside urologist for two and a half months.  When Dr. Roszhart recommended in March 2019 that Ms. Paris get a second opinion, the Decatur Medical Staff's decision not to refer Ms. Paris for a second opinion constituted deliberate indifference.  The Decatur Medical Staff also failed to investigate Ms. Paris's declination of the nephrostomy tube surgery and did not make any referrals to an urologist as recommended by Dr. Roszhart.  In light of Ms. Paris's history of cancer and warning signs that the cancer may have returned, the Decatur Medical Staff's inaction constituted deliberate indifference.  Even though Ms. Paris consistently and emphatically displayed intense pain, bloody urine, and incontinence for almost seven months, the Decatur Medical Staff never referred Ms. Paris to another urologist, ordered any further tests, or re-educated Ms. Paris on the potential necessity of the nephrostomy tube surgery.  This nonfeasance exacerbated Ms. Paris's condition and deviated so far from clearly established medical standards as to evidence deliberate indifference to Ms. Paris's serious medical needs.

110.    The Decatur Medical Staff's deprivation of Ms. Paris's Eighth Amendment rights directly and proximately caused her to suffer physical and mental injuries, including, but not limited to, months of unnecessary and prolonged pain and suffering, a more grave diagnosis, disability, loss of a normal life, and a diminished life span.   Before Defendants' inexcusable inaction, Ms. Paris's CT scans and biopsies reported only suspected signs of bladder cancer. Following Defendants' delays, subsequent CT scans and biopsies unmistakably showed the presence of metastatic cancer, which ultimately took Ms. Paris's life.   But for Defendants' delay in scheduling Ms. Paris's initial urology appointment for two and a half months, failure to schedule a second urology opinion for seven months, failure to order additional tests during that time, and failure to educate Ms. Paris on the recommended procedure, Ms. Paris's cancer would have been recognized sooner and treated before it spread, thereby giving her a longer life span.   That delay in providing Ms. Paris treatment could be catastrophic was foreseeable, given, among other things, Ms. Paris's history of cancer, her need for biannual surveillance testing, and her displayed symptoms of gross hematuria, dysuria, incontinence, and back pain.

111.    Because of these injuries, Mr. Paris, as Administrator for the Estate of Victoria L. Paris, is entitled to damages under 42 U.S.C. § 1983.

## COUNT II

## Violation of the Eighth Amendment to the U.S. Constitution and 42 U.S.C. § 1983

## (Against Wexford)

112.    The allegations of paragraphs 1 through 106 are incorporated herein by reference.

113.    At all relevant times, Wexford was under contract with the State of Illinois, through IDOC, to provide healthcare to inmates at Decatur Correctional Center, including Ms. Paris.   In this capacity, Wexford acted under color of state law and was responsible for the creation, implementation, oversight, and supervision of all policies and procedures followed by Wexford and IDOC employees who were medical care providers to inmates incarcerated at Decatur.

114.    Wexford had policies, customs, and practices that discouraged outpatient care and surgical treatment.   Specifically, it observed a custom of inaction and a practice of discouraging

specialty referrals. These customs and practices were well-settled and widespread among Wexford staff members. The Decatur Medical Staff and other Wexford personnel acted pursuant to these policies and procedures when they delayed scheduling an appointment with an outside urologist for two and a half months after a November 2018 CT scan revealed the possibility of cancer, repeatedly failed to refer Ms. Paris to a second urologist as requested by an outside specialist, failed to educate Ms. Paris on the potential necessity of the nephrostomy tube surgery, and failed to order further diagnostic testing or a specialist evaluation. These failures amounted to deliberate indifference to Ms. Paris's serious medical needs.

115. In addition, Wexford deliberately failed to promulgate policies that would monitor and ensure the proper treatment of inmates who had elevated risk of terminal illness. In failing to create such policies, Wexford was deliberately indifferent to a known or obvious risk that constitutional violations would occur. The failure to create these policies was a moving force behind the failure to treat Ms. Paris and directly and proximately caused her constitutional injury, physical injuries, and mental injuries.

116. Wexford had actual notice that its policies were deficient in regards to chronic care and specialty care by virtue of the 2014, 2018, and 2019 reports in *Lippert v. Godinez*. Wexford was aware that future constitutional violations were likely in light of these reports and the numerous lawsuits that have been filed alleging a failure to promulgate sufficient policies to protect inmates from chronic illnesses and terminal disease. These facts also made this risk obvious to Wexford. Still, Wexford consciously and deliberately chose not to adopt new policies.

117. Wexford's policies and procedures violated Ms. Paris's Eighth Amendment rights and directly and proximately caused Ms. Paris to suffer physical and mental injuries, including, but not limited to, months of unnecessary and prolonged pain and suffering, a more grave diagnosis, disability, loss of a normal life, and a diminished life span. Before Wexford's inexcusable inaction, Ms. Paris's CT scans and biopsies reported only suspected signs of bladder cancer. Following Wexford's delays, subsequent CT scans and biopsies unmistakably showed the presence of metastatic cancer, which ultimately took Ms. Paris's life. But for Wexford's custom

and practices—which were the moving forces behind Defendants' delay in scheduling Ms. Paris's initial appointment with an urologist for two and a half months, failure to schedule a second urology opinion for seven months, failure to order additional tests during that time, and failure to educate Ms. Paris on the recommended procedure—Ms. Paris's cancer would have been recognized sooner and treated before it spread, thereby giving her a longer life span. That this custom could result in such injury was foreseeable, given, among other things, Wexford's prior lawsuits, the numerous court-appointed expert reports, and the elevated risk Ms. Paris faced as a cancer survivor.

118.    Because of these injuries, Mr. Paris, as Administrator for the Estate of Victoria L. Paris, is entitled to damages under 42 U.S.C. § 1983.

## COUNT III

**Violation of the Fourteenth Amendment to the U.S. Constitution and 42 U.S.C. § 1983**

**(Against the Decatur Medical Staff)**

119.    The allegations of paragraphs 1 through 106 are incorporated herein by reference.

120.    The Decatur Medical Staff, while acting under color of state law, performed their duties in a manner that evidence deliberate, reckless and/or callous indifference to Ms. Paris's right to medical information, thus depriving Ms. Paris of her rights protected by the Fourteenth Amendment of the United States Constitution.

121.    The Decatur Medical Staff were deliberately indifferent to Ms. Paris's right to medical information when they failed to tell Ms. Paris of the significance of the nephrostomy tube surgery scheduled in April 2019 and the risks inaction would pose. Despite warnings and recommendations from Dr. Muscato and Dr. Roszhart, the Decatur Medical Staff failed to give Ms. Paris important information about the consequences of her decision. Defendants knew of the procedure's potential importance, especially given Ms. Paris's symptoms and history of cancer. Instead of informing Ms. Paris of the import of the procedure, they deferred their judgment to a patient who was not fully informed. Defendants' failure to provide Ms. Paris with necessary

information is particularly egregious in light of Ms. Paris's well-documented mental health conditions, which Defendants diagnosed, treated, and prescribed medications for.

122. A reasonable patient in Ms. Paris's position would deem such information necessary to make an informed decision on treatment. For many years, Ms. Paris had undergone surveillance procedures to monitor for cancer. The April 2019 nephrostomy tube surgery was potentially essential to that surveillance. Without it, Dr. Roszhart could not evaluate Ms. Paris's left ureter. Given the troubling urothelial thickening seen in two different CT scans in November 2018 and February 2019, a reasonable person in Defendants' position would deem it necessary to know that declining a nephrostomy tube surgery may result in bladder cancer going undetected. Had Ms. Paris been informed of that significance, she would not have declined the surgery. For years, Ms. Paris demonstrated a commitment to monitoring for cancer. She filed grievances against Defendants when they threatened to withhold those surveillance efforts, and had she known of the consequences of declining the surgery, Ms. Paris would have accepted the surgery.

123. The Decatur Medical Staff's deprivations of Ms. Paris's Fourteenth Amendment rights directly and proximately caused Ms. Paris to suffer physical and mental injuries, including, but not limited to, months of unnecessary and prolonged pain and suffering, a more grave diagnosis, disability, loss of a normal life, and a diminished life span. Before Defendants' inexcusable inaction, Ms. Paris's CT scans and biopsies reported only suspected signs of bladder cancer. Many months later, after failing to inform Ms. Paris countless times of information a reasonable patient would deem necessary, subsequent CT scans and biopsies unmistakably showed the presence of metastatic cancer, which ultimately took Ms. Paris's life. But for Defendants' deliberate indifference to Ms. Paris's right to medical information, Ms. Paris's cancer would have been recognized sooner and treated before it spread, thereby giving her a longer life span. That this indifference could result in such injury was foreseeable, given, among other things, Ms. Paris's mental illnesses, her communications to Defendants that she was confused about her urologist's recommendations, and above all, her increasingly worsening symptoms of bladder cancer.

124.     Because of these injuries, Mr. Paris, as Administrator for the Estate of Victoria L. Paris, is entitled to damages under 42 U.S.C. § 1983.

**COUNT IV**

**Violation of the Fourteenth Amendment to the U.S. Constitution and 42 U.S.C. § 1983**

**(Against Wexford)**

125.     The allegations of paragraphs 1 through 106 are incorporated herein by reference.

126.     At all relevant times, Wexford was under contract with the State of Illinois, through IDOC, to provide healthcare to inmates at Decatur Correctional Center, including Ms. Paris.  In this capacity, Wexford acted under color of state law and was responsible for the creation, implementation, oversight, and supervision of all policies and procedures followed by Wexford and IDOC employees who were medical care providers to inmates incarcerated at Decatur.

127.     Wexford had policies, customs, and procedures that discouraged off-site referrals and specialist treatment.  The Decatur Medical Staff and other Wexford personnel acted pursuant to these policies and procedures when they failed to educate Ms. Paris on the potential necessity of off-site treatment—specifically, for the nephrostomy tube surgery scheduled in April 2019.  These failures amounted to deliberate indifference to Ms. Paris's right to informed consent.

128.     A reasonable patient in Ms. Paris's position would deem such information necessary to make an informed decision on treatment.  For many years, Ms. Paris had undergone surveillance procedures to monitor for cancer.  The April 2019 nephrostomy tube surgery was potentially essential to that surveillance.  Without it, Dr. Roszhart could not evaluate Ms. Paris's left ureter.  Given the troubling urothelial thickening seen in two different CT scans in November 2018 and February 2019, a reasonable person in Defendants' position would deem it necessary to know that declining a nephrostomy tube surgery may result in bladder cancer going undetected.  Had Ms. Paris been informed of that significance, she would not have declined the surgery.  For years, Ms. Paris demonstrated a commitment to monitoring for cancer.  She filed grievances against Defendants when they threatened to withhold those surveillance efforts, and had she known of the consequences of declining the surgery, Ms. Paris would have accepted the surgery.

129.     Wexford's policies and procedures violated Ms. Paris's Fourteenth Amendment rights and directly and proximately caused Ms. Paris to suffer physical and mental injuries, including, but not limited to, months of unnecessary and prolonged pain and suffering, a more grave diagnosis, disability, loss of a normal life, and a diminished life span.  Before Wexford's inexcusable inaction, Ms. Paris's CT scans and biopsies reported only suspected signs of bladder cancer.  Following Wexford's inaction, subsequent CT scans and biopsies unmistakably showed the presence of metastatic cancer, which ultimately took Ms. Paris's life.  But for Wexford's custom and practice discouraging offsite referrals—which was a moving force behind Defendants' failure to educate Ms. Paris on the recommended procedure—Ms. Paris's cancer would have been recognized sooner and treated before it spread, thereby giving her a longer life span.  That this custom could result in such injury was foreseeable, given, among other things, Ms. Paris's mental illnesses, Wexford's prior lawsuits, the numerous court-appointed expert reports, and Ms. Paris's increasingly worsening condition.

130.     Because of these injuries, Mr. Paris, as Administrator for the Estate of Victoria L. Paris, is entitled to damages under 42 U.S.C. § 1983.

## COUNT V

## Medical Malpractice – Illinois Law

## (Against the Decatur Medical Staff)

131.     The allegations of paragraphs 1 through 106 are incorporated herein by reference.

132.     At all relevant times, it was the duty of the Decatur Medical Staff to exercise due care and caution in the treatment of their patients, including Ms. Paris.

133.     Despite this duty, the Decatur Medical Staff failed to exercise the care that a reasonably careful doctor, nurse, or physician assistant ordinarily would have used under the circumstances, and they were therefore negligent in their treatment of Ms. Paris.  The Decatur Medical Staff knew or should have known that any concern by a specialist—Dr. Muscato and Dr. Roszhart—warranted prompt investigation, especially in light of Ms. Paris's history of cancer and need for surveillance testing.  The Decatur Medical Staff also knew or should have known that an

outside referral was necessary for Ms. Paris to receive adequate diagnostic testing. The Decatur Medical Staff also received clear and persistent signs that further testing was necessary to diagnose Ms. Paris's condition but failed to order the requisite diagnostic testing. Furthermore, the Decatur Medical Staff breached their duty of care by failing to educate Ms. Paris on the potential importance of the nephrostomy tube surgery and the risks of declining the surgery.

134.     The Decatur Medical Staff's negligent acts and omissions directly and proximately caused Ms. Paris to suffer physical and mental injuries, including, but not limited to, months of unnecessary and prolonged pain and suffering, a more grave diagnosis, disability, loss of a normal life, and a diminished life span. Before Defendants' inexcusable inaction, Ms. Paris's CT scans and biopsies reported only suspected signs of bladder cancer. Following Defendants' delays, subsequent CT scans and biopsies unmistakably showed the presence of metastatic cancer, which ultimately took Ms. Paris's life. But for Defendants' delay in scheduling Ms. Paris's initial urology appointment for two and a half months, failure to schedule a second urology opinion for seven months, failure to order additional tests during that time, and failure to educate Ms. Paris on the recommended procedure, Ms. Paris's cancer would have been recognized sooner and treated before it spread, thereby giving her a longer life span. That delay in providing Ms. Paris treatment could be catastrophic was foreseeable, given, among other things, Ms. Paris's history of cancer, her need for biannual surveillance testing, and her displayed symptoms of gross hematuria, dysuria, incontinence, and back pain.

135.     Because of these injuries, Mr. Paris, as Administrator for the Estate of Victoria L. Paris, is entitled to damages.

136.     The medical records pertaining to Ms. Paris's treatment have been reviewed by a licensed and actively practicing physician, who has determined that there is a reasonable and meritorious cause for the filing of a medical malpractice claim against the Decatur Medical Staff.

**COUNT VI**

**Respondeat Superior: Medical Malpractice – Illinois Law**

**(Against Wexford)**

137.    The allegations of paragraphs 1 through 106 and 131 through 136 are incorporated herein by reference.

138.    Wexford, through its agents, apparent agents, and/or employees, accepted Ms. Paris as a patient.  At all relevant times, these agents, apparent agents, and/or employees were acting within the scope of their employment with Wexford and had a duty to exercise due care and caution in the treatment of patients, including Ms. Paris.

139.    At all relevant times, Wexford, through its agents, apparent agents, and/or employees acting within the scope of their employment or agency relationship, failed to exercise due care and caution in its diagnosis of Ms. Paris's cancer.  Wexford's agents and employees received clear and persistent signs that further testing was necessary to diagnose Ms. Paris's condition but failed to promptly provide the requisite diagnostic testing.  Wexford's agents and employees also knew or should have known that promptly scheduling an outside referral was necessary for Ms. Paris to receive adequate diagnostic testing.  Despite this knowledge, Wexford's agents and employees delayed scheduling Ms. Paris's initial appointment with an urologist for two and a half months, failed to schedule a second urology opinion for seven months, failed to order off-site testing for seven months, and failed to provide Ms. Paris with sufficient information to exercise informed consent to the nephrostomy tube surgery.

140.    Wexford is vicariously liable for the negligent acts and omissions of its agents, apparent agents, and/or employees, including the Decatur Medical Staff, in their failure to exercise due care and caution in their diagnosis and treatment of Ms. Paris's cancer.

141.    The negligent acts and omissions of Wexford's agents and employees directly and proximately caused Ms. Paris to suffer physical and mental injuries, including, but not limited to, months of unnecessary and prolonged pain and suffering, a more grave diagnosis, disability, loss of a normal life, and a diminished life span.  Before the inexcusable inaction of Decatur Medical

34

Staff, Ms. Paris's CT scans and biopsies reported only suspected signs of bladder cancer. Following Decatur Medical Staff's delays, subsequent CT scans and biopsies unmistakably showed the presence of metastatic cancer, which ultimately took Ms. Paris's life. But for Decatur Medical Staff's delay in scheduling Ms. Paris's initial appointment with an urologist for two and a half months, failure to schedule a second urology opinion for seven months, failure to order additional tests during that time, and failure to educate Ms. Paris on the recommended procedure, Ms. Paris's cancer would have been recognized sooner and treated before it spread, thereby giving her a longer life span. That delay in providing Ms. Paris treatment could be catastrophic was foreseeable, given, among other things, Ms. Paris's history of cancer, her need for biannual surveillance testing, and her displayed symptoms of gross hematuria, dysuria, incontinence, and back pain.

142. Because of these injuries, Mr. Paris, as Administrator for the Estate of Victoria L. Paris, is entitled to damages.

## COUNT VII

### Institutional Negligence – Illinois Law

### (Against Wexford)

143. The allegations of paragraphs 1 through 106 are incorporated herein by reference.

144. At all relevant times, Wexford, as a health care provider, owed a duty to maintain adequate treatment policies and a duty to review and supervise the care of its patients, including Ms. Paris.

145. Despite this duty, Wexford failed to exercise the care that a reasonably careful health care institution would have used under the circumstances, and it was therefore negligent in its care of Ms. Paris. Wexford knew or should have known that its policies and procedures for approving specialty care and/or outside consultations, approving non-formulary tests and medications, and scheduling outside care constituted barriers to timely care and threats to patient health and safety. Wexford knew or should have known that its policies and procedures were likely to, and in fact did, cause delays in the approval and scheduling of Ms. Paris's diagnostic

testing and outside referrals, despite Ms. Paris's urgent need for a timely diagnosis and effective treatment. Yet Wexford adopted such policies and procedures and insisted that its employees comply.

146.     Wexford additionally failed to promulgate and follow the policies, procedures, and practices to select, staff, and supervise its employees, including nurses, treating physicians, and supervising physicians, that a reasonably careful health care institution would have promulgated and followed under the circumstances, and it was therefore negligent in its care of Ms. Paris. Wexford knew or should have known that its policies, procedures, and practices for selecting, staffing, and supervising its employees would likely result in, and in fact did result in, delays or negligent oversight in the diagnostic, surgical, pharmaceutical, and other medical care to IDOC inmates including Ms. Paris. Wexford's staff selection, staffing, and supervision policies, procedures, and practices unreasonably delayed Ms. Paris's initial appointment with an outside urologist, Ms. Paris's second urology opinion appointment, and diagnostic testing despite Ms. Paris's urgent need for a timely diagnosis and effective treatment. Yet Wexford adopted these policies, procedures, and practices nevertheless.

147.     Wexford's negligent acts and omissions directly and proximately caused Ms. Paris to suffer physical and mental injuries, including, but not limited to, months of unnecessary and prolonged pain and suffering, a more grave diagnosis, disability, loss of a normal life, and a diminished life span. Before Wexford's inexcusable inaction, Ms. Paris's CT scans and biopsies reported only suspected signs of bladder cancer. Many months later, subsequent CT scans and biopsies unmistakably showed the presence of metastatic cancer, which ultimately took Ms. Paris's life. But for Wexford's lack of treatment, training, and scheduling policies, Ms. Paris's cancer would have been recognized sooner and treated before it spread, thereby giving her a longer life span. That this lack of policies could result in such injury was foreseeable given Wexford's prior lawsuits, the numerous court-appointed expert reports, the knowledge that certain inmates, like Ms. Paris, faced an increased risk of cancer, and Ms. Paris's increasingly worsening condition in the absence of such policies.

148.    Because of these injuries, Mr. Paris, as Administrator for the Estate of Victoria L. Paris, is entitled to damages.

149.    The medical records pertaining to Ms. Paris's treatment have been reviewed by a licensed and actively practicing physician, who has determined that there is a reasonable and meritorious cause for the filing of an institutional negligence claim for medical malpractice against Wexford.

## COUNT VIII

## Wrongful Death – Illinois Law

## (Against the Decatur Medical Staff)

150.    The allegations of paragraphs 1 through 106 are incorporated herein by reference.

151.    At all relevant times, the Decatur Medical Staff, as health care providers with Wexford, owed a duty to render medical services to Ms. Paris, to diagnose and treat Ms. Paris, and not to negligently cause injury to Ms. Paris.

152.    The Decatur Medical Staff breached their duties of care by delaying scheduling Ms. Paris's initial appointment with an urologist for two and a half months, by failing to schedule Ms. Paris for a second urology opinion for seven months, by failing to order any diagnostic testing in the meantime, and by failing to educate Ms. Paris on the significance of the nephrostomy tube surgery and the risks of declining the surgery.

153.    This breach directly and proximately caused Ms. Paris's death. Before Defendants' inexcusable inaction, Ms. Paris's CT scans and biopsies reported only suspected signs of bladder cancer. Following Defendants' delays, subsequent CT scans and biopsies unmistakably showed the presence of metastatic cancer, which ultimately took Ms. Paris's life. But for Defendants' delay in scheduling Ms. Paris's initial urology appointment for two and a half months, failure to schedule a second urology opinion for seven months, failure to order additional tests during that time, and failure to educate Ms. Paris on the recommended procedure, Ms. Paris's cancer would have been recognized sooner and treated before it spread, thereby giving her a longer life span. That delay in providing Ms. Paris treatment could be catastrophic was foreseeable, given, among

other things, Ms. Paris's history of cancer, her need for biannual surveillance testing, and her displayed symptoms of gross hematuria, dysuria, incontinence, and back pain.

154.     Thus, Mr. Paris, as Administrator for the Estate of Victoria L. Paris, is entitled to damages.

## COUNT IX

## Respondeat Superior: Wrongful Death – Illinois Law

## (Against Wexford)

155.     The allegations of paragraphs 1 through 106 and 150 through 154 are incorporated herein by reference.

156.     Wexford, through its agents, apparent agents, and/or employees, accepted Ms. Paris as a patient.  At all relevant times, these agents, apparent agents, and/or employees were acting within the scope of their employment with Wexford and had a duty to exercise due care and caution in the treatment of patients, including Ms. Paris.

157.     At all relevant times, Wexford, through its agents, apparent agents, and/or employees acting within the scope of their employment or agency relationship, failed to exercise due care and caution in its diagnosis of Ms. Paris's cancer.  Wexford's agents and employees received clear and persistent signs that further testing and evaluation were necessary to diagnose Ms. Paris's condition but failed to promptly provide for the requisite diagnostic testing.  Wexford's agents and employees also knew or should have known that promptly scheduling an outside referral was necessary for Ms. Paris to receive adequate diagnostic testing.  Despite this knowledge, Wexford's agents and employees delayed scheduling Ms. Paris's initial appointment with an urologist for two and a half months, failed to schedule a second urology opinion for seven months, failed to order off-site testing for seven months, and failed to provide Ms. Paris with sufficient information to exercise informed consent to the nephrostomy tube surgery.

158.     The actions and inaction of Wexford, through its agents, apparent agents, and/or employees, directly and proximately caused Ms. Paris's death.  Before Defendants' unexplainable inaction, Ms. Paris's CT scans and biopsies reported only suspected signs of bladder cancer.

Following Defendants' delays, subsequent CT scans and biopsies unmistakably showed the presence of metastatic cancer, which ultimately took Ms. Paris's life. But for Defendants' delay in scheduling Ms. Paris's initial appointment with an urologist for two and a half months, failure to schedule a second urology opinion for seven months, failure to order additional tests during that time, and failure to educate Ms. Paris on the recommended procedure, Ms. Paris's cancer would have been recognized sooner and treated before it spread, thereby giving her a longer life span. That delay in providing Ms. Paris treatment could be catastrophic was foreseeable, given, among other things, Ms. Paris's history of cancer, her need for biannual surveillance testing, and her displayed symptoms of gross hematuria, dysuria, incontinence, and back pain.

159.    Thus, Mr. Paris, as Administrator for the Estate of Victoria L. Paris, is entitled to damages.

160.    Wexford is vicariously liable for the negligent acts and omissions of its agents, apparent agents, and/or employees, including the Decatur Medical Staff, in their failure to exercise due care and caution in their diagnosis and treatment of Ms. Paris's cancer.

**COUNT X**

**Wrongful Death – Illinois Law**

**(Against Wexford)**

161.    The allegations of paragraphs 1 through 106 are incorporated herein by reference.

162.    At all relevant times, Wexford, as a health care provider for IDOC inmates, owed a duty to render medical services to Ms. Paris, to diagnose and treat Ms. Paris, and not to negligently cause injury to Ms. Paris.

163.    Wexford breached its duty to Ms. Paris by employing policies, customs, and practices that minimized off-site referrals, delayed ordering additional testing, and encouraged Wexford doctors to be skeptical of serious medical needs despite overwhelming evidence. These policies included a custom of inaction, a practice of discouraging referrals, a failure to make policy for the treatment of inmates with high risk of terminal illness, and a practice of not communicating important medical information.

164.    This breach directly and proximately caused Ms. Paris's death.  Before Wexford's months of inaction, Ms. Paris's CT scans and biopsies reported only suspected signs of bladder cancer.  Following Wexford's delays, subsequent CT scans and biopsies unmistakably showed the presence of metastatic cancer, which ultimately took Ms. Paris's life.  But for Wexford's custom and practices—which were moving forces behind Defendants' delay in scheduling Ms. Paris's initial appointment with an urologist for two and a half months, failure to schedule a second urology opinion for seven months, failure to order additional tests during that time, and failure to educate Ms. Paris on the recommended procedure—Ms. Paris's cancer would have been recognized sooner and treated before it spread, thereby giving her a longer life span.  That such policies, customs, and practices could result in such injury was foreseeable, given, among other things, Wexford's prior lawsuits, the numerous court-appointed expert reports, and the knowledge that certain inmates, like Ms. Paris, faced an increased risk of cancer, and Ms. Paris's increasingly worsening condition.

165.    Thus, Mr. Paris, as Administrator for the Estate of Victoria L. Paris, is entitled to damages.

## COUNT XI

## Loss of Consortium – Illinois Law

## (Against the Decatur Medical Staff)

166.    The allegations of paragraphs 1 through 106, 131 through 136, and 150 through 154 are incorporated herein by reference.

167.    Mr. Paris was at all relevant times the lawful spouse of Ms. Paris.

168.    At all relevant times, the Decatur Medical Staff were responsible for the medical care of Ms. Paris and had a duty to exercise due care and caution in the treatment of patients, including Ms. Paris.

169.    The Decatur Medical Staff's tortious wrongs, as alleged in paragraphs 1 through 106, 131 through 136, and 150 through 154 directly and proximately caused Ms. Paris's death on March 16, 2020.

170.    The Decatur Medical Staff's tortious wrongs, as alleged in paragraphs 1 through 106, 131 through 136, and 150 through 154, directly and proximately caused Mr. Paris to be deprived of the love, society, companionship, assistance, and relations that Ms. Paris would be able to provide and in fact did provide prior to Defendants' wrongdoing.  Before Decatur Medical Staff's tortious wrongs, Ms. Paris's CT scans and biopsies reported only suspected signs of bladder cancer.  Following Decatur Medical Staff's actions and inactions, subsequent CT scans and biopsies unmistakably showed the presence of metastatic cancer, which ultimately took Ms. Paris's life.  But for Decatur Medical Staff's torts, Ms. Paris's cancer would have been recognized sooner and treated before it spread, thereby giving her a longer life span, and in turn, more time with Mr. Paris.  That Decatur Medical Staff's torts could be catastrophic was foreseeable, given, among other things, Ms. Paris's history of cancer, her need for biannual surveillance testing, and her displayed symptoms of gross hematuria, dysuria, incontinence, and back pain.

171.    Because of these injuries, Mr. Paris, in his personal capacity, is entitled to damages.

## COUNT XII

## Respondeat Superior: Loss of Consortium– Illinois Law

## (Against Wexford)

172.    The allegations of paragraphs 1 through 106 and 166 through 171 are incorporated herein by reference.

173.    Mr. Paris was at all relevant times the lawful spouse of Ms. Paris.

174.    Wexford, through its agents, apparent agents, and/or employees, accepted Ms. Paris as a patient.  At all relevant times, these agents, apparent agents, and/or employees were acting within the scope of their employment with Wexford and had a duty to exercise due care and caution in the treatment of patients, including Ms. Paris.

175.    At all relevant times, Wexford, through its agents, apparent agents, and/or employees acting within the scope of their employment or agency relationship, committed tortious wrongs as alleged in paragraphs 1 through 106, 131 through 136, and 150 through 154.

176.    The negligent acts and omissions of Wexford's agents and employees directly and proximately caused Ms. Paris's death on March 16, 2020.  The negligent acts and omissions of Wexford's agents and employees directly and proximately caused Mr. Paris to be deprived of the love, society, companionship, assistance, and relations that Ms. Paris would be able to provide and in fact did provide prior to Defendants' wrongdoing.  Before Decatur Medical Staff's tortious wrongs, Ms. Paris's CT scans and biopsies reported only suspected signs of bladder cancer. Following Decatur Medical Staff's actions and inactions, subsequent CT scans and biopsies unmistakably showed the presence of metastatic cancer, which ultimately took Ms. Paris's life. But for Decatur Medical Staff's torts, Ms. Paris's cancer would have been recognized sooner and treated before it spread, thereby giving her a longer life span, and in turn, more time with Mr. Paris. That Decatur Medical Staff's torts could be catastrophic was foreseeable, given, among other things, Ms. Paris's history of cancer, her need for biannual surveillance testing, and her displayed symptoms of gross hematuria, dysuria, incontinence, and back pain.

177.    Because of these injuries, Mr. Paris, in his personal capacity, is entitled to damages.

178.    Wexford is vicariously liable for the negligent acts and omissions of its agents, apparent agents, and/or employees, including the Decatur Medical Staff, in their failure to exercise due care and caution in their diagnosis and treatment of Ms. Paris's cancer.

### COUNT XIII

### Loss of Consortium – Illinois Law

### (Against Wexford)

179.    The allegations of paragraphs 1 through 106, 143 through 149, and 161 through 165 are incorporated herein by reference.

180.    Mr. Paris was at all relevant times the lawful spouse of Ms. Paris.

181.    Wexford's tortious wrongs, as alleged in paragraphs 1 through 106, 143 through 149, and 161 through 165, directly and proximately caused Ms. Paris's death on March 16, 2020.

182.    Wexford's tortious wrongs, as alleged in paragraphs 1 through 106, 143 through 149, and 161 through 165, directly and proximately caused Mr. Paris to be deprived of the love,

society, companionship, assistance, and relations that Ms. Paris would be able to provide and in fact did provide prior to Wexford's wrongdoing. Before Wexford's tortious wrongs, Ms. Paris's CT scans and biopsies reported only suspected signs of bladder cancer. Following Wexford's tortious actions and inactions, subsequent CT scans and biopsies unmistakably showed the presence of metastatic cancer, which ultimately took Ms. Paris's life. But for Wexford's torts, Ms. Paris's cancer would have been recognized sooner and treated before it spread, thereby giving her a longer life span, and in turn, more time with Mr. Paris. That Wexford's torts could result in such injury was foreseeable given Wexford's past litigation, the numerous court-appointed expert reports, and the knowledge that Ms. Paris faced an elevated risk of cancer.

183.    Because of these injuries, Mr. Paris, in his personal capacity, is entitled to damages.

## PRAYER FOR RELIEF

As a result of these violations, John Paris, as Administrator of the Estate of Victoria L. Paris, and in his personal capacity, requests that the Court grant the following relief against Defendants:

A.    Judgment for compensatory damages against all Defendants jointly and severally in an amount to be determined at trial;

B.    Judgment for punitive damages against all Defendants jointly and severally in an amount to be determined at trial;

C.    Judgment for nominal damages to vindicate the violation of Ms. Paris's rights under the Constitution of the United States;

D.    An award of the costs of this action against all Defendants jointly and severally, including but not limited to reasonable attorneys' fees and expert fees, in accordance with 42 U.S.C. § 1988; and

E.    Such other and further relief that the Court deems appropriate.

## JURY DEMAND

John Paris, as Administrator of the Estate of Victoria L. Paris, and in his personal capacity, respectfully demands trial by jury of all triable matters.

Dated: June 23, 2021

Respectfully submitted,

/s/ _Laura Hulce_____

Michael A. Doornweerd
Laura E.B. Hulce
Ali I. Alsarraf
Lina R. Powell
Michael B. Kang
Henry A. Leaman
Jenner & Block LLP
353 N. Clark Street
Chicago, IL 60654-3456
Telephone:  +1 312 222 9350
Facsimile:  +1 312 527 0484
mdoornweerd@jenner.com
lhulce@jenner.com
aalsarraf@jenner.com
linapowell@jenner.com
mkang@jenner.com
hleaman@jenner.com

*Counsel for Plaintiff*